# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| STEVEN D. MORRISON,<br><br>    Plaintiff,<br><br>  v.<br><br>UNITED STATES OF AMERICA and CHENEGA INTEGRATED SYSTEMS, LLC,<br><br>    Defendants. | Case No. 4:15-cv-00014-SLG |

## **MEMORANDUM OF DECISION**

### I. Introduction

This is an action brought against the United States in which Plaintiff seeks compensation for injuries he suffered after he slipped and fell on January 20, 2012 at an inspection tent located at the front gate of Eielson Air Force Base. A bench trial in the case was held in August 2018.

Federal Rule of Civil Procedure 52(a) provides that "in an action tried on the facts without a jury . . . the court must find the facts specially and state its conclusions of law separately." Having considered the testimony of the witnesses, the exhibits admitted into evidence, and the parties' arguments and filings, this Court now makes the Findings of Fact and Conclusions of Law as set forth below.[1]

---

[1] This Memorandum of Decision does not purport to recite all of the evidence submitted and arguments made by the parties. *See* Fed. R. Civ. P. 52(a) Advisory Committee's Note (1946 Amendment). ("[T]he judge need only make brief, definite, pertinent findings and conclusions upon the contested matters; there is no necessity for over-elaboration of detail or particularization of facts.").

## II. Findings of Fact

**1. Property Ownership**: At all relevant times, the United States designed and owned the real property at issue in this case, an open-ended drive-through "Inspection Tent" located at the front gate of Eielson Air Force Base (EAFB), just east of Fairbanks, Alaska.

**2. Property Manager**: At all relevant times, the United States 354 Civil Engineering Squadron (CES) was the "Property Manager" for the "Inspection Tent."

**3. Property Maintenance**: In the winter of 2011–2012, U.S. personnel regularly operated snow removal vehicles under the "Inspection Tent" when necessitated by weather conditions.

**4. Finished Concrete Walkways**: The design plans and the final build of the "Inspection Tent" included "finished concrete" walkways, which were exposed to outdoor snow and ice conditions during Alaskan winters.

**5. Plaintiff's Status**: On January 20, 2012, Plaintiff Steven Morrison was a commercial delivery driver for Pacific Alaska Freightways (PAF), attempting entry to EAFB for a delivery.

**6. Chenega's Involvement**: At all relevant times, the U.S. had contracted with Defendant Chenega Integrated Systems, LLC (Chenega) for Chenega to perform "in a safe manner" vehicle safety inspections at the "Inspection Tent."

**7. Inspection Process**: To enter EAFB, the United States requires commercial drivers such as Morrison to: (a) drive their vehicles to the "Inspection Tent"; (b) exit their vehicle only when (and as) directed by an armed inspector; (c) open all

required portions of their vehicle for inspection; (d) wait in an adjoining room; (e) return to their vehicle only when (and as) directed by an armed inspector; and (f) enter EAFB if they passed inspection.

8. **United States Participation in Inspections**: On occasion, United States personnel would, at unscheduled times, participate in the vehicle inspection process under the "Inspection Tent."

9. **Conditions under Inspection Tent**: The area under the "Inspection Tent" where commercial drivers would walk from their vehicle to the waiting room and back was often slippery in the winter. The slipperiness was exacerbated by the fact that the concrete floor surface was not brushed or otherwise textured, and because many vehicles would idle at the Inspection Tent and their heat would create ice on the concrete.

10. **Warning to the United States**: Months before January 20, 2012, Timothy D. Horn, site manager for Chenega, notified the government that the area where Morrison later fell was unreasonably slippery. He asked the United States for help making it safer, but the government took no action.

11. **Visual Signs/Warnings**: At all relevant times, there were no signs or visual warnings to warn drivers such as Morrison about the potential slipperiness at the "Inspection Tent."

12. **Audible Signs/Warnings**: Although there were no set procedures, inspectors would occasionally warn drivers such as Morrison when ordering them to exit their vehicles of slippery conditions under the "Inspection Tent." Morrison did not

Case No. 4:15-cv-00014-SLG, *Morrison v. United States, et al.*
Memorandum of Decision
Page 3 of 10

receive such a warning on January 20, 2012.

13. **United States Maintenance Efforts**: No evidence was presented that the government made efforts to ensure that the area under the "Inspection Tent" was maintained with ice melt, sand, or other abrasives that might increase traction for drivers exiting their vehicles on the finished concrete surface, such as Morrison.

14. **Chenega Employees Issued Cleats**: Chenega employees were issued cleats for use under the "Inspection Tent" in the winter; however, they were not required to wear them.

15. **Events of January 20, 2012**: Morrison was a driver for PAF, attempting to enter EAFB for a commercial delivery. At the front gate, he was directed to: (a) drive his vehicle to the "Inspection Tent"; (b) exit his vehicle when directed by an armed inspector; (c) open all required portions of his vehicle for inspection; (d) wait in an adjoining room; and (e) return to his vehicle only when (and as) directed by an armed inspector. Morrison exited his vehicle and went to the waiting room without incident. Morrison then returned to his vehicle using the same path he had used when he exited his vehicle. Morrison slipped on the snow/ice covered "finished concrete" under the "Inspection Tent." He injured his right knee in the fall. Another PAF driver retrieved Morrison's PAF vehicle. A third PAF employee took Morrison directly to a doctor, where he was diagnosed with a torn right meniscus and a torn right ACL.

16. **Morrison's Position When He Slipped**: At the time of the fall, Morrison was where he had been told to be by an armed inspector.

17. **Morrison's Two Prior Knee Injuries**: Before January 20, 2012, Morrison

twice injured his right knee ACL and had related surgery on it.

18. **Morrison's Right Knee was Asymptomatic and Stable on January 20, 2012**: Morrison's right knee was asymptomatic and stable on the date of the incident. Morrison had not received any medical care related to his right knee since April 8, 2010, nearly two years before January 20, 2012.

19. **Right Knee Injury**: Morrison heard a "pop" as he lost his footing on January 20, 2012.

20. **Past Medical Bills**: Morrison has undergone four right knee surgeries since January 20, 2012. Morrison's total past medical bills were stipulated to be: $326,088.69 (Exhibit 3).

21. **Past Lost Wages**: Morrison's unrebutted vocational expert, Carl Gann, opined as to past economic/vocational losses—quantified by Plaintiff's forensic economist Hugh Richards. However, the Court will not award lost wages for the period beginning when Morrison started working at the DOT, which consists of lost overtime. Based on the Court's review of Mr. Richard's calculations, the lost wages for the period prior to that are approximately $160,000.

22. **Past Alaska Stat. § 09.17.010 Noneconomic Losses**: Pursuant to Alaska Stat. § 09.17.010(c) and *Beaulieu v. Elliott*, 434 P. 2d 665 (Alaska 1967), a per diem award of past non-economic losses is appropriate under Alaskan law. The Court finds Morrison's past non-economic losses amount to an average of $25.00 per day from January 20, 2012, to the start of trial (2,391 days), which equals $59,775. In making this award, the Court finds that on some days Morrison has had only limited

pain and suffering associated with this injury, and on other days, particularly shortly after the injury and after each surgery, Morrison has had considerable pain and suffering associated with this injury.

23. **Future Medical Bills**: The Court finds it more likely than not that Morrison will require at least two right knee full arthroplasties over the balance of his life expectancy, costing a total of an estimated $204,000.00. However, the Court finds that 10% of this cost should be attributed to the two prior knee injuries; therefore, the Court finds that Morrison's future medical bills associated with this injury are $183,600. Plaintiff's demonstrative that showed the number of doctor's visits per month after each knee injury was quite persuasive in making this allocation.

24. **Future Lost Wages**: Morrison did not establish by a preponderance of the evidence that he will incur any future wage losses as a result of this injury. Specifically, based upon the Court's consideration of all of the evidence, the Court was not persuaded that as a result of this injury, Morrison will need and pursue retraining and begin a completely new career after he has had his first knee replacement surgery in a few years.

25. **Future Alaska Stat. § 09.17.010 Noneconomic Losses**: Pursuant to Alaska Stat. § 09.17.010(c) and *Beaulieu v. Elliott*, 434 P.2d 665 (Alaska 1967), an award of future noneconomic losses is appropriate under Alaskan law. The Court finds Morrison's future non-economic losses associated with this injury associated with this injury are $70,000. In this regard, the Court has considered the pain and suffering associated with the anticipated future surgeries.

## III. CONCLUSIONS OF LAW

1. **Alaskan Substantive Law Applies:** This Court applies Alaskan substantive law and Federal procedural law.

2. **Burden of Proof.** Plaintiff has the burden of proving his claim by a preponderance of the evidence, which means that the trier of fact must be persuaded by the evidence that the claim is more likely true than not true.

3. **Landowner Liability**: In *Webb v. City & Borough of Sitka*, 561 P.2d 731, 733–34 (Alaska 1977) (*superceded in part by* AS 09.65.200, *as recognized in Univ. of Alaska v. Shanti*, 835 P.2d 1224, 1228 n.5 (Alaska 1992), the Alaska Supreme Court held: "A landowner or owner of other property must act as a reasonable person in maintaining his property in a reasonably safe condition in view of all the circumstances, including the likelihood of injury to others, the seriousness of the injury, and the burden on the respective parties of avoiding the risk."

4. **Elements of Negligence.** As in any negligence case, a plaintiff in a slip-and-fall action "has the burden of showing that the defendant owed [the plaintiff] a duty, that the defendant breached that duty, that [the plaintiff] was injured, and that the breach of duty was the proximate cause of [the plaintiff's] injury." *Edenshaw v. Safeway, Inc.*, 186 P.3d 568, 571 (Alaska 2008).

5. **The Property Manager is Responsible for "Inspection Tent" Maintenance**: The United States is the relevant landowner and is responsible for ensuring that the areas where drivers are directed to walk under the "Inspection Tent"

were, at all times, maintained in a "reasonably safe condition in view of all the circumstances."

**6.     Notice.**  The Alaska Supreme Court has held that actual or constructive notice of a hazardous condition is one factor that a factfinder may consider in determining reasonableness; it is not an element of a prima facie case in a slip-and-fall action. *Edenshaw*, 186 P.3d at 579-571.

**7.     United States/Chenega Legal Fault Allocation**: Alaska Stat. § 09.17.080 and *Evans v. State*, 56 P.3d 1046, 1059 (Alaska 2002), authorize this Court to apportion fault to all parties and non-parties "released from liability." Chenega was released from liability by Morrison. This Court thus must determine liability for: (a) the United States; (b) Morrison; and (c) Chenega. The Court must determine the "equitable share of damages and enter judgment in accordance with [Chenega's] percentage of fault."

**8.     Contractual Fault Allocation to Chenega**: The United States/Chenega Inspection Contract does not specifically allocate responsibility for the safety of drivers walking on the surface of the Inspection Tent to Chenega beyond generally requiring inspections to be done "safely."  Based on the evidence presented at trial, the Court will not allocate any fault to Chenega for Morrison's injury.

**9. Alaska Stat. § 09.17.080 Comparative Fault**: Pursuant to Alaska Stat. § 09.17.080, the Court will not allocate fault to Morrison with respect to the cause of the fall.  But the Court does find that Morrison did not mitigate certain damages as set forth herein.

**10. The "Inspection Tent" Area was not Reasonably Safe**: Morrison established by a preponderance of the evidence that on January 20, 2012, the United States had the duty to maintain the area under the "Inspection Tent," but that the area was not so maintained at that time in view of all the circumstances.

**11. Unsafe Surface was a Substantial Factor in Morrison's Injuries**: The United States' breach of its duty to ensure the areas under the "Inspection Tent" were maintained in a reasonably safe condition was a substantial factor in bringing about Morrison's January 20, 2012, fall and injury/aggravation of his right knee. *LaMoureaux v. Totem Ocean Trailer Express, Inc.*, 632 P.2d 539 (Alaska 1981); *Tolan v. ERA Helicopters, Inc.*, 699 P.2d 1265 (Alaska 1985).

**12. Mitigation**: Morrison appropriately mitigated his past medical damages. Indeed, he missed many appointments for physical therapy such that had he followed all treatment advice his past medical damages would have been higher. But Morrison did not appropriately mitigate his past non-economic loss and past lost wages. A review of the medical records indicates many skipped physical therapy appointments and incidents in which Morrison did not wear a prescribed knee brace. The Court also finds that if Morrison had followed all treatment advice, his future medical bills and future non-economic losses would also have been correspondingly reduced. Based on these findings, the Court finds that each of these damages awards should be reduced by 15%.

**13. Medical Billings**: Morrison's past medical care and billings are reasonable and necessary, and were incurred due to the January 20, 2012, fall.

**14. Judgment for Morrison**: Morrison thus is entitled to judgment in his favor, and against the United States, as follows:

| | | |
|---|---|---:|
| A. | Past Medical Bills: | $326,089 |
| B. | Past Lost Wages (less 15%): | $136,000 |
| C. | Past Non-Economic Losses (less 15%) | $50,809 |
| D. | Future Medical Bills (less 15%): | $156,060 |
| E. | Future Lost Wages: | $0 |
| F. | Future Non-Economic Losses (less 15%): | <u>$59,500</u> |
| | **Total:** | **$728,458** |

DATED this 22nd day of February, 2019, at Anchorage, Alaska.

<u>/s/ Sharon L. Gleason</u>
UNITED STATES DISTRICT JUDGE